IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **SHARON FREEMAN**, on behalf of herself and all similarly situated persons, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 14 C 10265 |
| **KAPLAN, INC.**, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Sharon Freeman ("Freeman") has brought a putative Class Action Complaint against Kaplan, Inc. ("Kaplan"), alleging violations of the Fair Labor Standards Act ("FLSA," 29 U.S.C. §§ 201 et seq.[1]) and the Illinois Minimum Wage Law ("Wage Law," 820 ILCS 105/1 to 105/15) by failing to pay her a minimum wage in an acceptable medium and in a timely fashion. Kaplan has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 on the ground that Freeman was an outside sales employee and therefore exempt from the requirements of both the FLSA and the Wage Law.[2] After Freeman responded to that motion, Kaplan filed a reply

---

[1] All further FLSA references will take the form "Section --," using the Title 29 numbering rather than the FLSA's internal numbering.

[2] Both parties agree that for the purposes of this motion the Wage Law's outside sales exemption is coterminous with the FLSA's. That position reflects the Illinois practice of interpreting the Wage Law in accordance with its federal counterpart when no Illinois cases are on point (e.g., Lewis v. Giordano's Enters., Inc., 397 Ill. App. 3d 581, 588, 921 N.E.2d 740, 746 (1st Dist. 2009); 56 Ill. Admin. Code § 210.120). Because that is the situation here, this opinion dispenses with any analysis of the Wage Law as such and focuses instead on federal cases and regulations interpreting the FLSA.

memorandum, teeing up the dispute for decision. For the reasons set forth in this opinion, Kaplan's motion is denied.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to the nonmovant (here Freeman) and draw all reasonable inferences in her favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Factual and Procedural Background[3]

This lawsuit arises out of work Freeman did for Kaplan while she was a law student at Loyola University Law School ("Loyola") in Chicago. Kaplan is in the business of creating and

---

[3] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion identifies Kaplan's and Freeman's respective submissions as "K." and "F." followed by appropriate designations: LR 56.1 statements as "St. ¶ --," responsive statements as "Resp. St. ¶ --" and memoranda as "Mem. --" and "Reply Mem. --." Naturally, given the requirements of Rule 56, this opinion recounts the facts in the light most favorable to Freeman and resolves factual disputes in her favor.

selling study materials and review courses, including prep courses for the bar exams of numerous states (K. St. ¶ 2). Kaplan also sells study materials and courses aimed at improving law students' performance in their first-year courses (id.).

Kaplan hires law students to help sell its test-prep products on their law school campuses, calling those students "student reps" (Freeman Dep. 11:22-12:7). Student reps sell Kaplan test-prep courses and materials to their peers and do general promotional work on behalf of Kaplan products (id.).

At all times relevant to this case Kaplan compensated student reps and hereafter-described "head reps" on a per-task basis rather than on a time basis and paid them in "credits" rather than currency (K. St. Ex. 4 at 000261[4]). Students received credits only for completing some of the tasks they performed, some of which were enumerated in Kaplan policies and some of which were decided at the Kaplan regional director's discretion (K. St. ¶ 11; Freeman Dep. 20:11-21:10). Among the tasks that Kaplan policies set out, student reps and "head reps" were to receive 5 credits for successfully enrolling a student in a Kaplan bar-exam prep course, 1 credit for enrolling students in other Kaplan courses, 1 credit for recruiting another student to work as a student rep and 25 credits for agreeing to serve as "head rep" (K. St. ¶ 11). Those credits could be redeemed only with Kaplan, only in certain increments and only for certain goods and services -- for example, a student rep could redeem 25 credits for a Kaplan

---

[4] K. St. Ex. 4 reproduces Kaplan's Student Representative Terms & Conditions, which are required to be agreed to by every student rep. Further references to that document will take the form "T&C" followed by Kaplan's six-digit Bates number designated in this lawsuit.

bar-exam prep course or 10 credits for a third-party gift card (Freeman Decl. ¶¶ 5-7; T&C 000261).[5]

Kaplan hired Freeman as a student rep in March 2013 (K. St. ¶ 7). Kaplan's regional director, who brought Freeman on, assured her that even if she did not sell many bar-review courses the director would still "take care of" Freeman (Freeman Dep. 20:11-20:19). Because the director accompanied that assurance with a statement that "all of [her] reps get their courses" (id. 21:4-21:10), Freeman took the director to mean that she would have the opportunity to earn at least 25 credits (the cost of a bar course) in a variety of ways apart from sales (id.). Apparently true to her word, the director offered Freeman the position as head rep in September 2013, an offer that Freeman accepted in exchange for 25 credits (K. St. ¶ 12). Freeman stayed in that position until May 2014 (id. ¶ 1).

So in total Freeman worked for Kaplan from March 2013 to May 2014. During that period of some 14 months she logged (in her estimation) 55.5 hours of work for Kaplan (K. St. ¶ 23) and made just one sale (Freeman Decl. ¶ 9). She did a variety of tasks, recounted in the next paragraph, during those hours.

Freeman first completed her initial training (id. ¶ 22). After that, one of her primary responsibilities was to help set up, man and then take down the "Kaplan table" -- Kaplan's regional director would rent space from Loyola about twice a month to set up a table full of promotional materials and giveaways to attract student attention and promote sales of Kaplan's

---

[5] Actually Kaplan's T&C 000261 promised student reps that they could redeem 10 credits for $100 cash, but Freeman submitted a declaration stating that to her knowledge Kaplan never paid a student rep in cash but only in gift cards (Freeman Decl. ¶ 7). Of course Freeman has no personal knowledge of how Kaplan conducts its law school sales nationwide, so the commonsense import of her statement is that student reps whom she knew at Loyola received only gift cards and not cash.

law-related courses (K. St. ¶ 24; Freeman Decl. ¶ 10). Freeman also regularly met one-on-one with students that Kaplan put in touch with her, doing so at specific times and Loyola campus locations selected by Kaplan (Freeman Dep. 120:20-121:6). At Kaplan's direction Freeman posted fliers on Loyola bulletin boards, wrote Kaplan-themed messages on Loyola classroom blackboards and personally made Kaplan-themed announcements in Loyola classes (id. 46:9-53:12). Freeman also spent time answering customer emails (some of which were forwarded to her by Kaplan, and each of which Kaplan required her to answer within 24 hours) (F. Resp. St. ¶ 29, T&C 000261). She ran two Kaplan-themed promotional events at a Starbucks near Loyola (F. Resp. St. ¶ 30). Finally, she did general organizational and clerical tasks for Kaplan and received ongoing training (Freeman Dep. 30:13-30:21; Freeman Decl. ¶ 17).

For those 55.5 hours of work Freeman earned 47 credits.[6] Freeman redeemed 25 of her credits for one of Kaplan's bar-review courses and took that course in the summer of 2015 (Freeman Dep. 9:9-9:11). Kaplan wrongly credited Freeman with only 5 of the remaining 22 credits she had earned, so that Freeman was prevented from receiving any compensation for the remainder of her work -- Kaplan allowed its sales employees to redeem credits only in 25-credit or 10-credit increments (Freeman Decl. ¶¶ 3-6).

Freeman filed this lawsuit as a proposed class and collective action on December 22, 2014. After the parties engaged in discovery, Kaplan filed its current motion, which as stated earlier is now ripe for decision.

---

[6] Although the record does not state exactly how Freeman earned those 47 credits, apparently 25 came from her becoming a head rep and 5 came from her signing up one student for a Kaplan bar review course, with the remainder earned by her completing undisclosed tasks.

### FLSA "Outside Salesman" Exemption

On its face Freeman's Complaint pleads facts tending to show that Kaplan violated FLSA Sections 206 and 203(m) -- provisions that call for a minimum wage timely paid in cash or its equivalent or in certain employer-provided facilities (see 29 C.F.R. § 531.27[7]) -- by paying her only once yearly in "credits" of uncertain value. While Section 206 generally covers any employee of an employer in interstate commerce, several classes of workers are explicitly exempted from the reach of Sections 206 and 207. Among those exempted workers are those "employed . . . in the capacity of outside salesman" (Section 213(a)(1)), and Kaplan's argument on summary judgment is that Freeman fits squarely within that exemption.[8] Freeman denies that is so.

There are some general principles that guide the analysis of FLSA claims. Blanchar v. Standard Ins. Co., 736 F.3d 753, 756 (7th Cir. 2013) (internal quotation marks and citations omitted) provides a useful starting point:

> The evaluation of a FLSA claim requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities. The burden is on the employer to establish that an employee is covered by a FLSA exemption.

---

[7] All future references to the Secretary of Labor's regulations implementing the FLSA will simply take the form "Reg. § --," omitting the prefatory "29 C.F.R."

[8] Because Kaplan's motion is limited to that issue, its function fits more within the scope of Rule 16's pretrial matters than within the more conventional Rule 56 motion -- for example, the litigants have not addressed any of the other material questions likely to be contested in this action, such as whether Freeman was indeed Kaplan's employee within the meaning of Section 203, whether the "credits" with which she was paid were "negotiable instruments" or "other facilities" (or neither) within the meaning of Reg. § 531.27 and -- should it turn out that the credits were "other facilities" -- how to value them under Reg. § 531.3. For the present, then, this opinion must assume that all those other questions would be resolved in favor of Freeman, but this Court of course expresses no view as to their ultimate merits.

And because the FLSA is intended to be a broadly remedial statute, its exemptions are to be construed narrowly. In practice that means that when there are real ambiguities of fact or law, the balance tilts in favor of finding the employee non-exempt (see <u>Yi v. Sterling Collision Ctrs., Inc.</u>, 480 F.3d 505, 508 (7th Cir. 2007)).

As for outside sales employees, <u>Christopher v. SmithKline Beecham Corp.</u>, 132 S. Ct. 2156, 2173 (2012) (internal quotation marks and citations omitted) recently spelled out some of the historical reasons for exempting those workers from the FLSA:

> The exemption is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay. It was also thought that exempt employees performed a kind of work that was difficult to standardize to any time frame and could not be easily spread to other workers. . . .

That underlying rationale, as will be seen, reinforces this Court's ultimate conclusion that summary judgment would be inappropriate given the facts of record.

But to turn now to the more concrete particulars, "outside salesman" is defined not by the FLSA itself but in a web of interlocking Department of Labor regulations. Foremost of those regulations is Reg. § 541.500(a):

> The term "employee employed in the capacity of outside salesman" in section [213(a)(1)] of the Act shall mean any employee:
>     (1)    Whose primary duty is:
>         (i) making sales within the meaning of section [203(k)] of the Act, or
>         (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>     (2)    Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.[9]

---

[9] For the most part the analysis in this opinion focuses on Freeman's relationship with Kaplan as head rep -- not on her single sign-up of a student for a bar review course, credited to Freeman's own account (but see nn. 8 and 14 and the final paragraph of this opinion).

If those words were given their ordinary meanings Kaplan's motion could be granted, and rather easily. That is so because Freeman admits (1) that her entire job was to help sell Kaplan products (apparently satisfying the "primary duty [of] making sales" requirement (subsection (a)(1)(i)) and (2) that she did her job almost entirely at Loyola (apparently satisfying the "customarily and regularly engaged away from the employer's place of places of business" requirement (subsection (a)(2)).

But as it happens, almost <u>none</u> of the operative terms in Reg. § 541.500(a) has its ordinary meaning. Rather each of the terms "primary duty [of] making sales," "customarily and regularly" and "away from the employer's place or places of business" has a definition (or at least an explanation) set out in Department of Labor regulations -- and most of those regulatory definitions diverge in significant ways from their dictionary counterparts. At least under the presumptions that govern Rule 56, that divergence is the difference between granting and denying Kaplan's motion.

**"Primary duty [of] making sales"**

To satisfy the first component of the outside sales exemption, Kaplan must show that Freeman's "primary duty" was "making sales" (Reg. § 541.500(a)(1)(i)).[10] Freeman and Kaplan

---

[10] Subsection (a)(1)(ii) provides an alternative route for satisfying the "primary duty" concept, but its "obtaining orders or concepts for services" component clearly parallels the "making sales" component as explained in the ensuing textual discussion. It is therefore unnecessary to explore that second alternative here.

do not dispute that she engaged in "making sales,"[11] but they do disagree over whether that was her "primary duty."

Under Reg. § 541.700(a) "'primary duty' means the principal, main, major or most important duty that the employee performs."  Primary duty is determined by considering the employee's job as a whole (id.; Reg. § 541.500(b)).  That is all straightforward enough, but there is a special rule that applies when considering whether "making sales" is the employee's primary duty, and Freeman argues that rule takes her out of the exemption.

That rule is Reg. § 541.503, and it addresses promotion work.  In short, only promotion work that an employee does with the purpose of drumming up business for her own account can support a finding that an employee has a primary duty of sales.  Paragraph (a) of the regulation makes that clear:

> Promotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

And giving the example of a company representative who visits chain stores to arrange merchandise and consult with store managers, "but does not obtain a commitment for additional purchases," paragraph (c) of the same regulation states that such an employee's work is non-exempt "[b]ecause the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale."  Gregory v. First Title of Am., Inc., 555 F.3d 1300,

---

[11] Section 203(k) provides that "sale" means -- among other things -- "any sale, exchange, contract to sell . . . or other disposition."  Neither party disputes that signing up one's fellow students for Kaplan courses and obligating them to pay for those courses fits within that statutory definition.

1309 (11th Cir. 2009) (per curiam), echoing guidance from the Department of Labor, has described promotion work as "paving the way" for sales by other employees.

Freeman asserts in a declaration submitted after her deposition that at least once she became a head rep her primary duty was general promotion of Kaplan products rather than making sales for her own account (Freeman Decl. ¶¶ 8-9, 15).  She says that as a head rep she no longer attempted to consummate sales and was not expected to do so (id. ¶ 15).  Rather she did background work that paved the way for student reps to sell (id. ¶ 9).  Hence, her lawyers argue, Freeman does not fit into the outside sales exemption.

Kaplan counters that Freeman's declaration contradicts her deposition testimony and must therefore be ignored (K. Reply Mem. 5-6).  Kaplan points out that during Freeman's deposition she repeatedly acknowledged that her "goal" was "sales" (id. 5-7).  Because Freeman admitted the purpose of the various tasks she completed was sales, says Kaplan, she cannot now say that her primary duty was not bringing about sales.

It is certainly true that Freeman cannot manufacture a dispute of fact by submitting a declaration that contradicts her earlier deposition testimony (Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005)).  But the problem with Kaplan's argument is that it ignores the reality that all promotion work has the goal of sales -- the crucial question, and the dividing line between exempt and non-exempt promotion work, is whose sales are the goal.  As Christopher, 132 S. Ct. at 2170 pointed out:

> The promotion-work regulation does not distinguish between promotion work and sales; rather, it distinguishes between exempt promotion work and nonexempt promotion work.

Freeman's deposition testimony is fundamentally ambiguous on the question whose sales she meant to promote.  First off, Freeman made statements that the goal of much of her work --

such as writing copy for Loyola's daily announcements, meeting with groups of students, tabling, training and demonstrating bar review material -- was generically "making sales" or "promoting Kaplan" (Freeman Dep. 42:8-43:15, 47:22-48:6, 49:1-49:22).  That, as has just been made plain, tells us nothing about whether her work was exempt, because it tells us nothing about who she expected would make (or attempt to make) the sale.  Then there are a few statements where Freeman did admit that, at least as to making certain Facebook posts and responding to customer questions via text and email, her goal was to close a sale herself (id. 44:21-46:8).[12]  And then there are other moments in Freeman's deposition where she made it clear that her work was to promote Kaplan generally rather than close sales on her own account, such as when she made in-class announcements, wrote on chalkboards and posted Kaplan fliers (id. 46:9-47:21, 52:9-53:12).  In those latter instances she said that her goal was more general: "just to inform" the potential customers about Kaplan's products, in one representative instance (id. 53:10-53:12).  Finally and most tellingly, when defense counsel asked Freeman whether she thought her "key duty as a student rep was to get [her] classmates to enroll," Freeman responded, "I believe it was one of the primary duties as well as just providing information" (id. 57:24-58:7).

In sum, Freeman's deposition testimony was fundamentally ambiguous on the question whether she was doing exempt or non-exempt promotional work.  Hence Freeman's declaration is not inconsistent with her deposition -- on the contrary, it makes sense of some of the

_____
[12] Freeman also said that the goal of carrying enrollment forms with her was to make sales and that the goal of Kaplan's maintenance of a Google document of potential customers was to provide her with sales targets (Freeman Dep. 50:2-51:14). But it appears from the record that she never attempted to sign up a student with the enrollment forms Kaplan required her to carry, and the record is silent as to whether she ever used the Kaplan-maintained customer list.  It is also worth noting that defense counsel's questions and Freeman's responses left it totally unclear whether she did particular tasks while employed as a student rep or as a head rep.

- 11 -

deposition's ambiguities by clarifying that once she became head rep she stopped doing sales work for her own account (Freeman Decl. ¶ 15), which of course implies that she had earlier done some sales work as a student rep. Because Freeman's declaration plainly does not contradict her deposition testimony, it is admissible on summary judgment.

With the declaration considered appropriately along with the rest of the record, Kaplan's motion plainly must be denied as to Freeman's time as head rep. Freeman avers in her declaration that in exchange for agreeing to work as head rep she was "paid" the 25 credits necessary to enroll in a bar course (compared to the 5 credits she would get for closing a sale), that she therefore stopped trying to close sales herself and, indeed, that she was not expected to do so (Freeman Decl. ¶¶ 8-15).[13] She also states that she earned 47 credits in total, but only 5 were for making a single sale (id. ¶¶ 3, 9; Freeman Dep. 20:5-20:9) -- hence the vast majority of her compensation came from completing non-sales tasks.

Thus, because Freeman obviously spent much of her time as head rep fulfilling various non-exempt promotional activities rather than doing sales, and because Kaplan's compensation structure made sales a tiny proportion of Freeman's total compensation, a jury could certainly conclude that Freeman did not have a primary duty of sales (see Killion v. KeHe Distribs., LLC, 761 F.3d 574, 585 (6th Cir. 2014). That being the case, Kaplan's motion for summary judgment must be denied as to the period when Freeman worked as a head rep.[14]

---

[13] Kaplan correctly points out that Freeman stated in her deposition that she did mostly the same work while a head rep (just more of it) that she did while a student rep. But saying that she did the same work does not mean she had the same goal in doing that work.

[14] Importantly, that could very well deep-six Freeman's hope of representing a class or collective group of all student reps Kaplan has employed for the past three years. That is so because Freeman's status as head rep with primarily non-exempt duties gives her a defense to the

(continued)

It is a very different story for Freeman's limited time spent as a student rep. For that job she could earn more compensation by closing sales than by carrying out any other compensable task (K. St. ¶ 11; Freeman Dep. 20:11-21:10). Freeman did testify that Kaplan's regional director indicated that Freeman would earn a bar review course whether or not she was successful in making sales -- but the director honored that promise by moving Freeman to head rep, not by giving her non-sales duties in her capacity as a student rep. Finally, Freeman's declaration testimony that she stopped doing sales work once she became head rep necessarily implies that she <u>did</u> earlier do some sales work as a student rep. In short, nothing in the record could reasonably support the inference that Freeman's primary duty as a student rep was anything other than making sales herself. Indeed, that appears to have been the purpose of her employment during that limited time period.

**Away from the "employer's place of business"**

But the fact that Freeman had a primary duty of making sales during the portion of the time when she worked as a student rep does not end the inquiry. To fit Freeman into the outside sales exemption Kaplan must also show that Freeman was "customarily and regularly engaged away from [Kaplan's] place or places of business in performing such primary duty" (Reg. § 541.500). Kaplan argues that Freeman never worked at one of Kaplan's places of business because she worked mostly at Loyola and that its law school is not a Kaplan "place of

_____
(footnote continued)
exemption that few members of the proposed class or collective group would share. And that in turn could render her not "similarly situated" to such other employees within the meaning of Section 216(b). Then again, as this opinion will soon set out, Freeman and other Kaplan employees may not have been exempt even while serving in roles with a primary duty of generating sales. This Court therefore reserves ruling on Freeman's motion for conditional certification and notice (Dkt. 32) and invites Kaplan to address the just-highlighted issue in its response to that motion.

business" -- but even if it were, says Kaplan, Freeman worked away from it "customarily and regularly."  Freeman counters that "place of business" has a much broader meaning under Department of Labor regulations than in common parlance, so that in fact Loyola qualifies as one of Kaplan's places of business under the relevant regulations.  And, says Freeman, she worked away from Loyola only occasionally.  For reasons that will shortly be made clear, Freeman has the better of the argument.

Reg. § 541.502 elaborates on the meaning of "away from the employer's place or places of business."  No Court of Appeals has ever interpreted that regulation, so the parties seek to rely principally on opinion letters from the Department of Labor's Wage and Hour Division (along with a smattering of district court cases) in their competing readings of the regulation, which reads in its entirety:

> An outside sales employee must be customarily and regularly engaged "away from the employer's place or places of business."  The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home.  Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls.  Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.  However, an outside sales employee does not lose the exemption by displaying samples in hotel sample rooms during trips from city to city; these sample rooms should not be considered as the employer's places of business.  Similarly, an outside sales employee does not lose the exemption by displaying the employer's products at a trade show.  If selling actually occurs, rather than just sales promotion, trade shows of short duration (i.e., one or two weeks) should not be considered as the employer's place of business.

About the only real message conveyed by the line of demarcation traced by that description is that it does not provide a <u>bright</u>-line definition.  But fortunately for analytical

purposes, focusing on the relationship between Kaplan's activities and those of an employee such as Freeman provides a satisfactory answer to the inquiry.

In that respect Loyola was surely a Kaplan place of business within the meaning of that regulation. Kaplan regularly rented space from Loyola to put up a table and sell its courses and materials: It certainly did so throughout the 14 months or so of Freeman's employment, far longer than the "short duration" spoken of by the regulation as to trade shows (where, it should be noted, employers also rent space to put up tables and sell goods and services). And Kaplan was not absent from Loyola in between tabling sessions. On the contrary, it maintained several sales employees (Freeman among them) on the Loyola campus -- people who used Loyola as their base of operations (Freeman Dep. 58:13-59:2; T&C 000261). Kaplan regularly directed Freeman to hold one-on-one meetings in particular places on Loyola's property, to make announcements in Loyola classrooms and to use Loyola's bulletin boards and internal mailing system to advertise Kaplan products. There is no evidence in the record that Kaplan's Loyola-based sales force ever traveled to other campuses to sell Kaplan products, rather than being hired to sell at Loyola and nowhere else.

In summary, there can be no doubt on this record that Loyola fits the description of "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales." Hence it was one of Kaplan's places of business "even though," as the regulation explicitly allows, Kaplan was "not in any formal sense the owner or tenant of the property."

Kaplan attempts to avert that conclusion by citing to Department of Labor Wage and Hour Division opinion letters, but none of them is persuasive.[15] Opinion Letter FLSA2008-6NA involved sales employees who set up shop at a new store every three to six days, while Freeman remained at -- and sold only at -- Loyola for months on end. Opinion Letters FLSA2007-2 and FLSA2007-4 dealt with the sale and leasing of real estate, and the question whether "any fixed site" might include the very properties up for sale or rent posed an unusual scenario that made the employers' continuing possessory interest in those purported "places of business" a relevant factor to weigh. Here of course Freeman was selling study courses, not Loyola campus buildings, so the exception that those letters carved out to Reg. § 541.502's usual rule -- that "even though the employer is not in any formal sense the owner or tenant of the property," "any fixed site" can be an employer's "place of business" -- simply does not apply. Loyola fits well within the broad parameters that the regulation sets for an "employer's place of business."[16]

As it happens, that conclusion comports not only with the plain language of the regulation (as has just been shown) but also with the purpose of the outside sales exemption. As said earlier, that exemption was premised on the idea that outside sales employees are largely

---

[15] Persuasion is indeed what is at issue, rather than deference under Auer v. Robbins, 519 U.S. 452, 461 (1997), because all of the cited opinion letters expressly limit themselves to their own facts. And none of the cited letters is based on facts analogous to those presented by Kaplan's business model.

[16] Equally unpersuasive is Kaplan's assertions that "customer's place of business" means simply the "location of the customers" (which would include Loyola) and that no "location of the customers" can also be an "employer's place of business" (K. Mem. 7). That reading sweeps so broadly that it conflicts with the last sentence of Reg. § 541.502, which holds that long-running trade shows are to be considered the employer's place of business -- even though, of course, such shows are not only the "location of the customers" but also occur at places not usually owned or even controlled by the employer. Contrary to Kaplan's preferred reading of Reg. § 541.502, the unmistakable thrust of that regulation is that "customer's place of business" is a narrow category and "employer's place of business" is a broad one.

self-directed, making it impossible (or at least overly difficult) for employers to track their hours or spread their work should one or another of them reach an hours limit (Christopher, 132 S. Ct. at 2173). But here Kaplan undisputedly had its sales employees, including Freeman, all working at a single physical plant that their supervisor visited regularly (Freeman reported that she received much direct supervision from that supervisor), and Kaplan had a system for scheduling student rep and head rep work hours remotely. All of that suggests it would pose no great challenge for Kaplan to track sales work by the hour rather than by the completed task. Moreover, the type of selling Freeman described -- in which student reps and head reps communicated with potential customers in a piecemeal fashion, so that it was often pretty much a random matter as to who received the commission for a particular sale (Freeman Decl. ¶ 13) -- would easily allow for work to be spread.

Taken together, all of those facts make it clear that the usual rationale for finding particular employees exempt as outside sales employees is simply not operative here. Instead, consideration of the exemption's purposes in light of the record facts reinforces this Court's conclusion that Loyola was a "place of business" for Kaplan within the regulatory meaning of that term.

**"Customarily and regularly"**

Because Loyola is one of Kaplan's "places of business" for purposes of the outside sales exemption, Freeman will fit within that exemption only if Kaplan can show that she "customarily and regularly" (Reg. § 541.500(a)(2)) made sales or solicitations away from Loyola. Reg. § 541.701 defines "customarily and regularly":

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work

performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

Kaplan submits that because Freeman estimated that she spent about 20% of her time working off-campus (Freeman Decl. ¶ 21), she performed her primary duty of sales away from Loyola "customarily and regularly" as a matter of law.  That portion of Freeman's work hours might perhaps reflect customary and regular work away from campus <u>if</u> it were in fact performed customarily and regularly, but here Kaplan has made no showing as to the frequency or regularity of Freeman's work.  On that score it must be remembered that Freeman worked only a total of 55.5 hours for Kaplan, 20% of which is 11.1 hours.  Without any guidance from the record about how "regularly" Freeman performed her off-campus work, there is just no basis upon which to conclude that Freeman's (estimated) 11 off-campus hours of work over the course of more than one academic year occurred "customarily and regularly," rather than being "occasional," "isolated or one-time tasks."  Freeman could have racked up those few hours of work in the course of more than a year by (for example) running two one-off promotional events and sending a few emails.  Of course, she might instead have run weekly 15-minute sales events.  But the point is that the record says only how much total time Freeman spent working off-campus.  It says precious little about how that time was distributed -- whether it was customary and regular or occasional and infrequent.  Given the record's silence on that central question, inferences must be drawn in favor of Freeman, so that Kaplan's motion must be denied for that reason as well.

## Conclusion

Freeman has raised an issue of material fact as to whether she had a "primary duty [of] making sales" while she was employed as a head rep.  Furthermore, the record as it stands leaves

no doubt that Loyola was a "place of business" for Kaplan within the meaning of Reg. §§ 541.500 and 541.502. Finally, there is a dispute of fact as to whether Freeman "customarily and regularly" engaged in the "primary duty [of] making sales" away from Loyola. For those reasons, Kaplan's Dkt. No. 28 motion -- imperfectly characterized as one seeking summary judgment -- must be and is denied.

In retrospect, this Court is left with major misgivings about having allowed the parties to cabin that motion as they have, imposing such a major burden of time and effort on this Court and its excellent law clerk Michael Schorsch to address and resolve only one corner in the wide panoply of issues posed by this case -- issues that comprise not only such questions as those referred to briefly in nn. 8 and 14 but, far more importantly, such questions as whether the pittance of time and effort that Freeman devoted to her brief stint as a student rep makes her a suitable representative for a class or collective group of Kaplan student reps, or whether creating a more limited head rep group representation by Freeman would satisfy the other legal requirements for class or collective representation, or whether -- this list could go on at great length, but this opinion will not do so lest its listing might mistakenly be regarded as exhaustive. Lawyers for both sides are ordered to appear for a status hearing at 9:15 a.m. October 2, 2015 to determine the best way to go forward.

_____
Milton I. Shadur
Senior United States District Judge

Date: September 25, 2015